UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| DARLA D. (BEASLEY) ELKINS, | ) | |
| (Social Security No. XXX-XX-2287), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:08-cv-77-WGH-DFH |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE JUDGE'S FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the consents of the parties (Docket Nos. 7, 9) and an Order of Reference dated July 29, 2008 (Docket No. 12). The parties filed their briefs at Docket Nos. 21, 26, and 27. The Magistrate Judge heard oral argument on March 16, 2009, at which the plaintiff was represented by counsel, Steven K. Robison, in person, and the defendant was represented by Special Assistant United States Attorney Janet Gumm, by telephone.

## I.  Statement of the Case

Plaintiff, Darla D. Elkins, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Social Security Income ("SSI") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. §

404.1520(f).  The court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB and SSI on February 11, 2004, alleging disability since October 17, 2003.  (R. 94-96).  The agency denied Plaintiff's application both initially and on reconsideration.  (R. 73-80).  Plaintiff appeared and testified at a hearing before Administrative Law Judge Jay Levine ("ALJ") on July 31, 2006.  (R. 330-65).  Plaintiff was represented by an attorney; also testifying was a vocational expert ("VE").  (R. 330).  On October 23, 2006, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy.  (R. 57-65).  After Plaintiff filed a request for review, the Appeals Council remanded the case for further consideration by the ALJ; the Appeals Council noted that the ALJ had found that Plaintiff's RFC included a sit-stand option but that there was no determination of the frequency of the option nor was the proper hypothetical question asked to the VE.  (R. 90-91).  The Appeals Council explicitly instructed the ALJ to specify how frequently Plaintiff would need to alternate between sitting and standing and then solicit testimony from the VE about the effect on the number of jobs available to Plaintiff.  (R. 90).  On remand, the new ALJ, Reinhardt Korte, conducted a hearing on September 24, 2007.  (R. 366-418).  Plaintiff was represented by an attorney; also testifying was a VE and two medical experts.  (R. 366).  On November 16, 2007, the ALJ issued his opinion (18-25); the ALJ disregarded the instruction of the Appeals Council and instead found that Plaintiff was not disabled because she did not

suffer from any severe impairment at step two and, therefore, was not under a disability. (R. 25). The Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 3-5). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on May 20, 2008, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 40 years old at the time of the ALJ's decision and had a high school education. (R. 63). Her past relevant work experience included work as a certified nursing assistant, a short order cook, a warehouse order puller, and a manufacturer's representative. (R. 63).

### B.  Medical Evidence

#### 1.  Evidence of Plaintiff's Impairments

On October 17, 2003, Plaintiff suffered injuries resulting from an automobile accident. (R. 158). Plaintiff was in a head-on collision at 60 miles per hour and suffered a loss of consciousness and head trauma. (R. 158). Plaintiff was seen in the emergency room at the University of Louisville Hospital by Royce Coleman, M.D. (R. 160-61). Plaintiff complained of right hip tenderness and lumbar spine tenderness, and she suffered an abrasion to her anterior chest. (R. 160). X-rays showed mild rotation with questionable widening of Plaintiff's sacroiliac joint on the left, but otherwise showed normal results. (R. 161). A CT scan of Plaintiff's cervical spine showed degenerative changes at C5-6 and slight rotation. (R. 163). A CT scan of Plaintiff's pelvis

-3-

showed a right lower lateral minimally displaced rib fracture.  (R. 165).  Plaintiff also suffered loss of normal lordosis.  (R. 171).

Plaintiff's primary treating physician is David R. Baker, M.D.  At a visit to his office on October 24, 2003, a week after Plaintiff's accident, it was noted that Plaintiff complained of pressure in her right ear and the right side of her face felt numb.  (R. 274).  She stated that she saw silver streaks when she laid down, but felt better if she laid down, and she was often dizzy.  (R. 274).  The diagnosis was paresthesia of the face and vertigo.  A week later, Plaintiff went for a follow-up visit with Dr. Baker and reported that her dizziness was getting better when she wore her cervical collar, but if she stood for too long she would get dizzy and feel like she was going to pass out.  (R. 275).  She also complained of spasms in her neck and back.  (R. 275).

Plaintiff began physical therapy at Progressive Physical Therapy in Seymour, Indiana, on November 5, 2003.  (R. 181).  At this time, she was experiencing headaches, muscular pain at rest, difficulty sleeping, constant pain unrelieved by rest or movement, shortness of breath, dizziness, balance problems, unusual fatigue and weakness, tingling, numbness, loss of feeling, pain with coughing or sneezing, and changes in bowel and bladder habits.  (R. 186).  Plaintiff started physical therapy for two weeks, three times a week.  (R. 187).  Treatment included neck range of motion for strengthening her neck, increasing neck strength, increasing range of motion, and decreasing pain.  (R. 187).  On March 1, 2004, it was noted that Plaintiff had demonstrated improvement in strength and exercise tolerance.  (R. 191).  Plaintiff continued

physical therapy on March 3, 2004.  (R. 194).  It was noted that she had met all of her short-term goals and four of five long-term goals.  (R. 194).  Plaintiff did report that she continued to have some weakness and was "shaky."  (R. 195).

On February 4, 2004, Plaintiff was seen by Dr. Baker.  (R. 270).  She reported that she felt really weak on her right side.  She demonstrated pain on palpation of her lumbar spine.  (R. 270).  Plaintiff also complained of depression. (R. 270).

Ralph M. Buschbacher, M.D., performed an independent medical examination on April 30, 2004.  (R. 276-80).  The exam revealed that Plaintiff walked with a very slow, antalgic gait and has quite a lot of pain behavior.  (R. 279).  Plaintiff had moderately decreased back range of motion in all directions. (R. 279).  Dr. Buschbacher also stated that Plaintiff reported right upper extremity and right lower extremity pain with possibly a radiculopathy.  (R. 280). He reported any problems in these areas should be addressed with physical therapy.  (R. 280).

Dr. Buschbacher opined that Plaintiff had a post concussive syndrome, and he would recommend an MRI of the brain as well as a neuropsychological evaluation.  (R. 279).  Dr. Buschbacher also reported that this appeared to be causing Plaintiff some stress and anxiety which has caused a behavioral component to her symptoms.  (R. 279).  He recommended between two and five neuropsychology treatments and between five to ten therapy sessions working with a psychologist on muscle relaxation and to teach her how to deal with her mental problems in a more constructive manner.  (R. 280).  Dr. Buschbacher

reported that he thought all of Plaintiff's current symptoms were directly related to her motor vehicle accident, and she was not yet at maximum medical improvement.  (R. 280).

Plaintiff also underwent a consultative exam by clinical psychologist, Richard Karkut, Psy.D., on August 17, 2004.  (R. 281-85).  Plaintiff reported being depressed by her medical and financial problems, and that her symptoms contribute to her tendency not to change her clothes regularly or engage in recreational activities as frequently.  (R. 284).  Dr. Karkut noted that, although Plaintiff suffered a head injury in her accident, her WMS-III scores reveal no significant memory impairment, and she has no signs of post-traumatic stress disorder.  (R. 285).  Dr. Karkut diagnosed Plaintiff with major depressive disorder, single episode, mild.  (R. 284).  Plaintiff had a GAF score of 65.  (R. 285).

On September 9, 2004, State Agency psychologist K. Neville, Ph.D., considered Listing 12.04 for affective disorders and concluded that Plaintiff did not suffer from a severe impairment.  (R. 289).  A psychiatric review technique form reported that Plaintiff had a medically determinable impairment present that does not precisely satisfy the affective disorders criteria.  (R. 292).  The review revealed that Plaintiff has mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  (R. 299).

In April 2005, Plaintiff returned to Dr. Baker after an absence of a year.  (R. 311).  She reported that everything made her nervous, and she could not

work due to fatigue and anxiety.  (R. 311).  Dr. Baker renewed Plaintiff's medications and advised counseling.  (R. 311).

In May 2005, Plaintiff reported increased dizziness but decreased headaches.  (R. 310).  Things were "getting better."  (R. 310).

On April 21, 2006, Plaintiff saw R. Wayne Perry, M.D., at the request of Dr. Baker.  (R. 312-14).  Plaintiff complained of recent heavy menses.  (Tr. 312, 319).  Dr. Perry performed a dilation and curettage, with a final diagnosis of a benign endometrium.  (R. 316-18).

In April 2006, Plaintiff also returned to Dr. Baker and complained of stiffness, back pain, and dizziness when she stood up.  (R. 307).  Dr. Baker prescribed medication and, in May 2006, Plaintiff reported that her pain was "better."  (R. 307).  In May 2006, Dr. Baker diagnosed restless leg syndrome after Plaintiff reported increased "leg jerks."  (R. 306).  Later, on May 19, 2006, Plaintiff reported that she was sleeping a lot better after she started taking her medication.  (R. 305, 434).  Plaintiff reported that her pain was "tolerable."  (R. 305).

In May 2006, Plaintiff saw Karl W. Evans, Psy.D., at the request of Dr. Baker.  (R. 320-22).  Plaintiff reported left buttock pain radiating into her left leg.  (R. 320).  She also reported numbness and difficulties with falling.  (R. 320).  She also complained of left side neck pain.  (R. 320).  Plaintiff reported that she cared for her son, who had cerebral palsy, every other weekend.  (R. 321).  She reported a moderate activity level; she ran errands, watched her niece, cared for her dog, and did housework.  (R. 320).  Dr. Evans opined that Plaintiff's past

history of sexual and physical abuse "likely made her vulnerable to developing anxiety after her motor vehicle accident," and he recommended continued medication and psychological intervention for her past abuse and her chronic pain. (R. 322).

On June 15, 2006, Plaintiff reported to Dr. Baker that, concerning her back pain, she had good days and bad days. (R. 305). Also, Plaintiff complained of right ankle pain and instability. (R. 304). On examination, she had full right ankle range of motion. (R. 304).

In September 2006, Plaintiff complained of feeling stressed and having difficulty sleeping. (R. 433). She had not been taking her medications because she ran out of them. (R. 433). In October 2006, Plaintiff reported that her headaches were improved since she had been taking her medication. (R. 432). Dr. Baker noted that Plaintiff was "mild[ly] depressed." (R. 432). Her back was tender. (R. 432).

In May 2007, Plaintiff returned to Dr. Baker with complaints of difficulty sleeping due to leg cramps. (R. 431). In June 2007, Plaintiff reported that her medication helped, but she was still waking up two or three times a night with her legs kicking and moving. (R. 431).

In July 2007, Plaintiff reported difficulty with her 18-year-old son, resulting in her feeling stressed out. (R. 430). Plaintiff complained of right shoulder pain, defective fourth finger, low back aches, and right foot drop. (R. 430). Plaintiff displayed a slight limp in her gait, weakness in her right arm,

shoulder, and leg, a decreased range of motion in her right shoulder, and tenderness in her back at the SI joint.  (R. 430).

In August 2007, Plaintiff reported improvement with sleep and anxiety with medication.  (R. 429).  She still had some crying spells.  (R. 429).  She reported having flashbacks of her auto accident.  Additionally, she had tenderness in her SI joint, a limp, and a foot drop on her right side.  (R. 429).

Dr. Baker completed a RFC form in August 2007 and stated that the Plaintiff had agoraphobia related to a post-traumatic stress disorder as a result of her motor vehicle accident.  (R. 425).  Dr. Baker elaborated on Plaintiff's mental impairments and stated that she experiences limitations in the following: poor memory; general depression; feelings of guilt/worthlessness; difficulty concentrating/thinking; intrusive recollections of a traumatic experience; generalized persistent anxiety; pathological dependence or passivity; sleep disturbance; mood disturbance; loss of intellectual functioning; social withdrawal or isolation; decreased energy; and recurrent panic attacks.  (R. 423-24).  His reasoning for these limitations stemmed from Plaintiff's post-traumatic stress disorder, insomnia, anxiety with panic attacks, and depression.  (R. 424).  He stated that she does not deal with stress well, gets flustered, and is forgetful.  (R. 424).  Based on Plaintiff's mental impairments alone, Dr. Baker stated that Plaintiff would be absent from work much more than twice a month and episodically for a few days each time.  (R. 424).

In terms of Plaintiff's physical impairments, Dr. Baker's RFC form stated that Plaintiff could carry less than five pounds due to right upper extremity

weakness and discoordination due to her motor vehicle accident.  (R. 420).  He also opined that she could walk "very little—much less than 2 hours" as she "fatigues easily due to insomnia, [and] discoordination of [her] right lower extremity."  (R. 421).  In addition, she could sit for less than two hours due to low back pain, right sacroiliac pain, and chronic inflammation.  (R. 421).  He further elaborated that her maximum sitting time is 15 minutes, and she must be able to sit or stand at will.  (R. 421).  He stated that this was observed in his office.  (R. 421).  Dr. Baker also stated that Plaintiff appeared poorly coordinated, lacked good hand-eye coordination or good finger dexterity, had significant ambulation difficulties, had significant exertional pain, and became fatigued with exertion and would need unscheduled breaks more often than every two hours.  (R. 423).  These difficulties were due to Plaintiff's sacroilitis with sciatic pain on the right side, right hand contractures, and right leg with discoordination and foot drop.  (R. 423).

In September 2007, Plaintiff reported a recent fall.  (R. 428).  Dr. Baker administered an injection.  (R. 428).  Dr. Baker diagnosed sacroilitis.  (R. 427).  A week later, Plaintiff reported that she felt "numb" at the waist, and Dr. Baker noted that it was "unusual" for an injection to cause numbness in the back, waist, and leg, when it was given in the hip area.  (R. 428).  Dr. Baker administered another injection.  (R. 427). Plaintiff displayed a tender SI joint, a limp, and weakness in her right extremities.  (R. 427).

## 2. Testimony of Medical Experts at Plaintiff's Administrative Hearing

Dr. Georgiann Pitcher testified that she did not see any mental health outpatient treatment in Plaintiff's past medical history. (R. 403). Dr. Pitcher testified that Plaintiff did undergo a mental status exam in 2004. (R. 403). At that time, Plaintiff was diagnosed with major depressive disorder which was related to her physical pain. (R. 404). Dr. Pitcher also testified that Plaintiff saw Dr. Evans of Columbus, Indiana, in July 2007, and he recommended psychiatric or psychological treatment to help her deal with the pain. (R. 404). Dr. Pitcher testified that Dr. Baker had completed a mental and emotional limitations questionnaire regarding Plaintiff after her accident. (R. 405). On the questionnaire, Dr. Baker indicated that Plaintiff had significant difficulty with work-related activities, difficulty maintaining attention for more than a two-hour period, difficulty maintaining work attendance, difficulty sustaining an ordinary work routine and completing a normal work day, and difficulty accepting instructions and responding appropriately. (R. 405). Dr. Pitcher testified that she was not refuting Dr. Baker's claims, even though they were not supported with psychological tests. (R. 405). Dr. Pitcher testified that Plaintiff's depression most likely came from the inability to physically be able to do a lot of the activities she used to partake in. (R. 406). Dr. Pitcher stated that the depression mildly affected Plaintiff's activities of daily life and social relationships, and that the depression did not seem to greatly affect her concentration and attention. (R. 406).

Dr. Julian Freeman questioned whether there was a clear statement or clinical examination by a physician describing the foot drop or the problems with the right hand that were described in Plaintiff's testimony.  (R. 409).  Plaintiff's attorney explained that the functional impairment form that Dr. Baker filled out was filled out in connection with an examination in which he described the foot drop and hand problem.  (R. 409-10).  Dr. Freeman testified that there was no evidence of any persistent physical impairment in the record and there were no clinical examination findings that would support the presence of a physical problem causing her symptoms.  (R. 410).  Dr. Freeman also testified that it was possible that Plaintiff has a significant neurological problem affecting her foot and leg and a contracture involving the hand.  (R. 411).  Dr. Freeman stated that since the clinical examine was normal, the circumstances would favor a somatoform disorder.  (R. 411).  Dr. Freeman testified that Plaintiff did not seem to present a medically determinable physical impairment.  (R. 411).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate

the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his/her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date and that Plaintiff was insured for DIB through December 31, 2009.  (R. 20).  The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had no impairments that are classified as severe.  (R. 20).  The ALJ, therefore, concluded that Plaintiff was not under a disability.  (R. 25).

## VI.  Issues

Plaintiff has raised four issues.  However, because this was a step-two finding by the ALJ, only one issue is pertinent to the court's analysis.  That issue is as follows:

**Is the ALJ's finding at step two supported by substantial evidence?**

Plaintiff argues that the ALJ's decision at step two of the five-step sequential evaluation process was not supported by substantial evidence because there is objective medical evidence in the record that demonstrates that Plaintiff had at least one severe impairment.  The Social Security regulations indicate that, in evaluating severity at step two, an impairment is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  SSR 85-28 further clarifies this situation, explaining that

> at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA.  An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is

-14-

> made at this step when medical evidence establishes only a slight
> abnormality or a combination of slight abnormalities which would
> have no more than a minimal effect on an individual's ability to work
> even if the individual's age, education, or work experience were
> specifically considered . . . .

SSR 85-28.  While it does not appear that the Seventh Circuit has analyzed what threshold of evidence is necessary to get beyond step two, the Ninth Circuit has explained that step two is a de minimis screening device used to dispose of only groundless claims.  *Webb v. Barnhart,* 433 F.3d 683, 688 (9th Cir. 2005). Hence, only when the evidence clearly establishes that there is a slight abnormality which only imposes a minimal impact on an individual's ability to do work may the ALJ stop at step two.  *Id.*

The ALJ expressly relied on Dr. Julian Freeman, the medical expert present telephonically at the hearing, and the State Agency physicians to establish that Plaintiff does not have a physical impairment which would significantly limit her ability to perform basic work-related activities for a period of 12 months.  (R. 24).  These are pieces of evidence that the ALJ was entitled to rely upon.  The ALJ did discuss the fact that Plaintiff's treating physician, Dr. Baker, found a higher degree of restriction, and in fact found such a high degree of limitation that it was unsupported by the evidence of record.  (R. 25).  While the ALJ was free to conclude that Dr. Baker's opinions as to the degree of impairment were improper, the treating physician report does reflect the existence of a "foot drop" (R. 422, 423, 429, 430); a "hand contracture (trigger finger)" (R. 422); and the existence of various mental health issues including "chronic insomnia recalcitrant to sleep aides therapy" (R. 425).  Dr. Baker states

-15-

that these mental health issues were "as a result of a MVA head-on collision

sustained October 2003," indicating continued treatment for well over one year.

These conditions, as described by Dr. Baker, appear to have lasted over one year

and would be more than slight abnormalities imposing minimal impact on

Plaintiff's ability to do work.

The ALJ also referenced Dr. Buschbacher's report (R. 276-80) for the

proposition that the doctor was "unable to identify pathology for her symptoms

and recommended her for testing." (R. 25). This, however, seems to be an

unduly restrictive reading of Dr. Buschbacher's assessment which states as

follows:

> 1. Status post motor vehicle accident. In my opinion she has had a post concussive syndrome and I would recommend that she have an MRI of the brain as well as a neuropsychological evaluation. She also appears to have some stress and anxiety associated with this. This has caused a behavioral component to her symptoms. I think that neuropsychologic testing will help with this and will help identify any objective deficits as well as to reassure her and offer compensatory strategies. I would recommend between two and five neuropsychology *treatment* sessions. Obviously, if the MRI shows any further abnormality this might need to be addressed.
>
> 2. Right upper extremity and right lower extremity pain with possibly a radiculopathy. I would recommend and [sic] EMG of both the right upper and right lower extremity as well as an MRI of the cervical spine and the lumbosacral spine to see if she has any objective evidence of radiculopathy and to help guide the treatment course. If she does have any abnormality in this area then this obviously would need to be addressed, most likely with a course of physical therapy.
>
> 3. I did not recommend any medication changes at this time but after the above testing *I would recommend another course of physical therapy most likely for a six week time period. She would most likely benefit from therapy to reduce her symptoms*

and then follow this with a conditioning exercise program for a
two week period.

4.     Ms. Beasley certainly *has a significant amount of stress,*
*anxiety, and pain behavior associated with her problem.*
*Nevertheless, I do think that she has real pathology* underlying
this and I think the injury has triggered the stress and anxiety
component.  I would recommend a period of five to ten therapy
sessions working with a psychologist on muscle relaxation and
to teach her how to deal with this problem in a more
constructive manner.

5.     In my opinion *her current symptoms are all directly related to*
*her motor vehicle accident of 10/17/03.*  I think that she
requires further evaluation and *treatment* as described above.
*She is not yet at maximal medical improvement.*

(R. 279-80) (emphasis added).

While Dr. Buschbacher's opinions do not unequivocally establish that
Plaintiff is disabled, they do describe her as having "real pathology" related to
her motor vehicle accident some four years before and needing not only testing
but *treatment*.  It is difficult to square the report with a finding that the pain and
mental health conditions are not at least "severe" as defined in the Social
Security regulations.

The ALJ also suggested that Dr. Evans' report referenced that Plaintiff
should "contact vocational rehabilitation" (R. 25) indicating that Plaintiff is
capable of working.  While Dr. Evans' report does so conclude (R. 302), the fact
that a person could benefit from vocational rehabilitation also suggests that
there are some conditions in existence that at least minimally affect the ability to
work.  Dr. Evans suggested that Plaintiff has the need for physical therapy for
her left lower extremity, "continued medical management via Zonaflex," and
"physiological intervention."  These recommendations are inconsistent with a

finding that Plaintiff has only a slight abnormality that has only a minimal impact on her ability to do work.

Finally, portions of the transcript of the hearing bear directly on the step two issue. In a colloquy between the medical expert, Dr. Pitcher, the Plaintiff's counsel, and the ALJ, the following occurred:

> Q  Doctor, does the depression more than minimally affect her in work-related areas of functioning?
> A  Well, I don't know about work-related areas directly for her. As far as the severity on the 12.04, in meeting the regulations, I don't think they are significant.
> Q  Okay. Let, let me, let me point out something to you, Doctor.
> A  Sure.
> Q  And that is that severity, for the purpose of meeting the listing, is --
> A  Yes.
> Q  -- in step three.
> A  Yes.
> Q  What I'm asking about is the step before that, step two, for which the severe simply means it has some impact that we can't ignore on the ability to engage in work-related functions. Now, with that concept, is the depression severe in your opinion.
> A  No, I don't believe so.
> Q  So, you believe the depression has no affect [sic] on her ability –
> A  No, I didn't say no affect [sic]. It has mild to moderate affect [sic], if that. But mild is all I am finding in the file.
> Q  Okay. But at mild to moderate, Judge, my view would be that it would be severe for step two. Now, again, I'm not saying that it meets the listing.
> A  And I don't engage in steps.
> ATTY:  Right, right.
> ALJ:  Yeah.
> ATTY:  But what I'm -- my, my point here is that --
> ALJ:  Are you trying to redefine severe?
> ATTY:  No, sir, not at all.
> ALJ:  Then what, what's [sic] she's already said, it, it was mild, and she didn't believe it was severe, and, and that's her testimony, and -- I don't know. From there on, if there's some question you can figure out that -- to ask her, I don't have a problem --
> ATTY:  No.

ALJ:  -- with that.

ATTY:  No.

ALJ:  We'll stay here as long as we need to, but --

ATTY:  I, I, I understand what her testimony is, and, and I, I have no further questions for her.

ALJ:  Okay.

ME #1:  In the -- excuse me, Your Honor, I didn't understand exactly where -- what he's saying.  In the PRT it says that the affective disorders, I just have to identify if there's a disturbance of mood, and I did.  And then I have to go to the B criteria, which are functional limitations --

ALJ:  Right.

ME #1:  -- daily living and social and -- and then I look in the file to see what rating I would give those.  And that's as far as I go.

ALJ:   Okay, Doctor, thank you.

(R. 406-08).

This exchange suggests to this court that, while Dr. Pitcher did not believe that Plaintiff's depression condition met Listing 12.04, the condition was at least serious enough to warrant analysis under that listing.  To do so, the depression condition must have been more than a slight abnormality.  Dr. Pitcher's testimony does not support a finding that Plaintiff's condition was not "severe" as defined at step two.

In summary, this is an exceedingly close call by the ALJ.  In support of his decision, he recites to Dr. Freeman and State Agency physicians -- which is proper.  However, the ALJ significantly misreads the reports of Dr. Buschbacher and Dr. Evans, and omits reference to several rather objective findings by the treating physician, Dr. Baker.  An ALJ is not required to write a perfect opinion.  It is widely known that the ALJs in the Social Security Administration have

extremely heavy caseloads.[1]  This court hesitates to add further burden by requiring additional analysis at later steps of the sequential evaluation process when not necessary.  However, in this case, the record shows that Plaintiff has psychological problems, a trigger finger, and at least occasionally a foot drop that are more than slight abnormalities and that have existed to some degree since 2003.  When in doubt, this court concludes that analysis on the merits is preferable to eliminating claims at an early screening stage.

## VII.  Conclusion

Although it is far from clear that Plaintiff is disabled, the record here does not allow the court to trace the path of the ALJ's reasoning as to why Plaintiff only has slight abnormalities that have no more than a minimal effect on her ability to work.  With due respect to the ALJ who did use obvious care in reviewing the record and articulating his reasons for the decision made, this court concludes that this claim must be **REMANDED** for further analysis at steps three, four, and, if necessary, five of the five-step sequential evaluation process required by the Social Security regulations.

**SO ORDERED.**

**Dated:**  April 24, 2009

WILLIAM G. HUSSMANN, JR.
Magistrate Judge

---

[1]Matt Sedensky, *Disability Claims Pile Up In Social Security*, EVANSVILLE COURIER & PRESS, April 2, 2009, at A5.

**<u>Electronic copies to</u>:**

Steven K. Robison
MONTGOMERY ELSNER & PARDIECK
srobison@meplegal.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov